IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STEPHANIE ERICKSON, et al., ) <br> ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ING LIFE INSURANCE & ANNUITY, ) <br> COMPANY, ) <br> ) <br>     Defendant. ) <br> _____ ) | Case No. CV09-204-S-EJL <br><br> **ORDER ON REPORT AND RECOMMENDATION** |

    On September 6, 2011, United States Magistrate Judge Larry M. Boyle issued a Report and Recommendation (Dkt. 89) in this matter. Pursuant to 28 U.S.C. § 636(b)(1), the parties had fourteen days in which to file written objections to the Report and Recommendation. Objections and responses to objections were filed by the parties. The matter is now ripe for the Court's review.

    Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." Moreover, this Court "shall make a de novo determination of those portions of the report which objection is made." *Id.* In *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003), the court interpreted the requirements of 28 U.S.C. 636(b)(1)(C):

**ORDER - 1**

> The statute [28 U.S.C. § 636(b)(1)(C)] makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise. As the *Peretz* Court instructed, "to the extent de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties." *Peretz*, 501 U.S. at 939 (internal citation omitted). Neither the Constitution nor the statute requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct. *See Ciapponi,* 77 F.3d at 1251 ("Absent an objection or request for review by the defendant, the district court was not required to engage in any more formal review of the plea proceeding."); *see also Peretz*, 501 U.S. at 937-39 (clarifying that de novo review not required for Article III purposes unless requested by the parties) . . . .

*See also Wang v. Masaitis*, 416 F.3d 993, 1000 & n.13 (9th Cir. 2005). In this case, both sides object to the Judge Boyle's recommendations.

## FACTUAL BACKGROUND[1]

Plaintiffs in this action are the Trustees and named fiduciaries of Building Materials Holding Corporation's (BMHC) BMCC Employees Savings & Retirement Plan ("the Plan"), and BHMC itself, as the Plan Sponsor and a Plan fiduciary. Defendant is ING Life Insurance & Annuity Company ("ILIAC"), who formerly held invested Plan funds and performed related administrative services.

This litigation concerns the replacement of ILIAC with another contracted provider, Prudential Retirement ("Prudential"), and an apparent failure of communication regarding the transfer of over $100 million of Plan funds upon the termination of ILIAC's services. Plaintiffs allege that because Prudential did not receive the funds before 4:00

---

[1] Factual Background is copied from Report and Recommendation, Dkt. 89, pp.1-9.

**ORDER - 2**

p.m. on the date of transfer, Prudential was unable to reinvest them into the market which resulted in a $375,790.16 loss to the Plan which Plaintiffs seek to recover from ILIAC.

In their complaint, Plaintiffs allege breach of fiduciary duty under several provisions of ERISA and under Idaho state law, negligence, promissory estoppel and breach of contract. ILIAC moved for summary judgment on Plaintiffs' claims for breach of fiduciary duty under ERISA, which this Court granted. *See Report and Recommendation* dated June 6, 2010 (Dkt. 53); *Order Adopting Report and Recommendations* dated July 22, 2010 (Dkt. 58). Now pending is Defendant's Motion for Summary Judgment (Dkt. 63). Judge Boyle recommended Defendant's motion for summary judgment be granted as to Counts Three (Breach of Fiduciary Duty), Four (Negligence) and Six (Promissory Estoppel), but denied as to Count Five (Breach of Contract).

As of January 23, 2008, ILIAC served as the record keeper and custodian of several retirement plans for Plaintiff, including "the Plan" at issue in this case. PSOF, ¶ 1.

The assets of the plans were invested primarily in mutual funds on the New York Stock Exchange, which are valued once a day, based upon the price of the stock at the close of the market at 4:00 p.m. Eastern Time (ET). *Plaintiff's Statement of Facts In Response to ILIAC's Motion for Summary Judgment Filed on October 20, 2010* ("PSOF")(Dkt. 69-1), ¶ 2. Funds must be invested prior to 4:00 p.m. ET to be valued at that day's closing price. *Id.* When being transferred from one custodian to another, the

**ORDER - 3**

funds must be received by the new custodian before 4:00 p.m. ET, otherwise they are treated as received the next day and invested at the next day's market price. *Id.*

In connection with the holding of the assets, ILIAC issued a Group Annuity Contract ("Contract") to the Plan trustees which contained a "payment" provision. This provision, Section 8.06 of the Contract, governed the transfer of the funds from ILIAC to the new custodian, Prudential, upon termination of the Contract. *Statement of Undisputed Material Facts Supporting Defendant's Motion for Summary Judgment on Remaining Counts in Plaintiffs' Complaint* ("SUMF") (Dkt. 64-1), ¶ 5; *Plaintiffs' Response to ILIAC's Motion for Summary Judgment Filed on October 20, 2010 (Clerk's Docket 63)* ("Plaintiff's Response to MSJ") (Dkt. 69), p. 6. This provision states:

> The Company will make Payments as directed by the Contract Holder, a Participant or such other authorized party, as applicable. Payment requests must be in writing or as otherwise allowed in administrative practice.

*Id.*; *Declaration of David C. Tarshes Regarding Plaintiffs' Response to ILIAC's Motion for Summary Judgment Filed on October 20, 2010* ("Tarshes Decl."), Exh. O.

The following series of written correspondence encompassed the parties' communications about the transfer. On January 23, 2008, Mark Kailer of BMHC, one of the trustees for the plans, wrote to Carol Decker of ILIAC, stating: "Please be advised that BMHC will be terminating our service agreement with ING Financial Advisors and its Affiliates and transferring the plans listed below to Prudential effective May 1, 2008." PSOF, 69-1, ¶ 4, *Tarshes Decl.*, Exh. TT.

**ORDER - 4**

On January 28, 2008, Ian Dunn of ILIAC wrote to Cynthia Shehan of BMHC, copying a representative of Prudential, as follows:

> [W]e will also require a letter signed by an authorized trustee advising us to liquidate the assets. The letter should include the requested effective date of the liquidation (valid *business day*), wire date (next valid *business day* following the liquidation) as well as transfer instructions (either wire instruction or check payee & mailing information) and a reason for leaving ING.
>
> Please know that forwarding assets to a new carrier by check is a 3-day process plus mailing time, however, the wiring of assets would occur the *business day* following the surrender.
>
> Wire instructions need to include the Bank Name, City & State of Bank, Account Name & Number, ABA Number.

PSOF, ¶ 5, *Tarshes Decl.*, Exh. P (emphasis added). Mr. Dunn testified in deposition that "the business day will typically – not typically, but does end at 4:00 p.m. eastern time." *Id.*

On February 28, 2008, Ian Dunn and Carol Decker from ILIAC, and Russell Wilhelm and Sandra Krapfl of Prudential, participated in a conference call to "discuss the mechanics of ILIAC's transfer of the money" in the Plan to Prudential. DSUMF, ¶ 13; PSOF ¶ 6. In preparation for the conference call, Prudential created a spreadsheet entitled "Transition Questions," that did not address the specific time of the wire transfer. DSUMF, ¶ 14. The participants to the conference call confirmed that ILIAC would liquidate the funds on April 30, and wire the funds to Prudential on May 1. PSOF, ¶ 6. None of the participants recall any specific discussion that the funds had to be received by Prudential by 4 p.m. on May 1. DSUMF, ¶¶ 16, 17; PSOF, ¶ 6. However, Mr. Wilhelm

**ORDER - 5**

believes, and will testify, that he followed Prudential's standard practice, which was to inform the prior record keepers/custodians that funds being transferred must reach Prudential prior to 4:00 p.m., so that they can be reinvested that same day. PSOF, ¶ 6.

On March 26, 2008, John O'Donnell of ILIAC wrote to Mark Kailer of BMHC, setting forth a schedule relating to the handling of the funds which included:

- April 30, 2008 – Assets are liquidated.

- May 1, 2008 – The business day after the liquidation occurs all assets will be wired to the new funding agent and the amount liquidated, detailed by fund, will be provided to your new record keeper.

PSOF, ¶ 8, *Tarshes Decl.*, Exh. UU.  Mr. Kailer understood that Mr. O'Donnell's reference to the assets being wired on the "business day" of May 1, was consistent with Mr. Kailer's understanding that the funds would be wired in time to be reinvested on May 1. *Id.*

On April 24, 2008, Stephanie Erickson, a named Plan trustee and BMHC's Vice President of Human Resources, wrote to Carol Decker of ILIAC:

As you are aware, we will be terminating our service agreement with your firm and transferring the above referenced plans to Prudential Retirement effective May 1, 2008.

Please liquidate the assets in all of the plans listed above on April 30, 2008 and wire the proceeds to Prudential on May 1, 2008 using the wire instructions below.

PSOF, ¶ 9, *Tarshes Decl.*, Exh. Q; DSOF ¶ 19.  This letter constituted the written instructions to ILIAC that Ian Dunn described would be necessary to effectuate the funds transfer in his correspondence of January 28. *See Tarshes Decl.*, Exh. P. These

**ORDER - 6**

instructions included the information that ILIAC requested pertaining to wire instructions in the January 28 letter, which did not include a specific time to direct the transfer. *Tarshes Decl.*, Exhs. P&Q. Ms. Erickson understood that in order for the transfer to be effective on May 1, the funds had to be wired to Prudential before the close of business, in time to be reinvested on May 1. PSOF, ¶ 9.

On April 30, 2008, Mr. Dunn of ILIAC e-mailed Celinda Downey of BMHC, and Ms. Decker and Mr. Wilhelm of Prudential: "We have all of the documentation to liquidate the plans today 4/30/08 and wire on 5/1/08." PSOF, ¶ 11; *Tarshes Decl.*, Exh. S. In reply, Mr. Wilhelm requested: "As soon as possible tomorrow, please provide me with a breakdown by fund of each of the wires you will be sending and the final amount of the market value adjustment." *Id.* Mr. Dunn replied, stating that: "We will be able to send once everything has been has been reconciled and hopefully it will be early." *Id.* Mr. Dunn testified that his goal was to provide this information early so that Prudential could reinvest the funds on May 1. *Id.; Tarshes Decl.*, Exhs. C, S (¶ 7 & Exh. 1 at 6-7), DD.

ILIAC liquidated the funds as planned on April 30. PSOF, ¶ 12. ILIAC's internal procedures required Mr. Dunn, located in Connecticut, to fax a written request for approval and initiation of any transfer above $50 million to ING's Treasury Services Department in Atlanta. *Id.*, at ¶ 13. Two of the fund transfers were under $50 million, approved and transferred by Mr. Dunn to Prudential by noon on May 1. *Id.*, at ¶ 14.

The largest fund, just over $100 million, required the Atlanta Treasury Services approval. PSOF, ¶ 15. At 10:50 a.m., Mr. Dunn faxed the wire request to the responsible

**ORDER - 7**

person in Atlanta, John Jutan, and received confirmation that the fax was transmitted successfully. PSOF, ¶ 16. The fax, however, was lost in the Atlanta office. *Id.* At 11:15 a.m., Mr. Dunn left a voice mail with Mr. Jutan asking if he had received the fax. *Id.*, at ¶ 17. At 11:39 a.m., Mr. Wilhelm e-mailed Mr. Dunn, stating: "I know it's early but I wanted to check on the status of the breakdown and wires? Also, just a reminder that Prudential needs to be in receipt of the wires by 4:00 p.m. eastern time in order to guarantee same day investment." PSOF, ¶ 18; *Tarshes Decl.*, Exh. S (¶ 8 & Ex. 1 thereto at 8), DD.

At 11:44 a.m., Mr. Dunn replied to Mr. Wilhelm, stating: "The plans liquidated successfully and we are having the wires approved now. I am also currently working on the breakdowns for each plan." PSOF, ¶ 19; *Tarshes Decl.*, Exhs. C at pp. 65-68; L at pp. 47-53; S (¶ 8 & Exh. 1 thereto at 8), DD. Following this e-mail, Mr. Wilhelm and Mr. Dunn spoke, and Mr. Wilhelm again reminded Mr. Dunn that Prudential needed to receive the funds prior to 4:00 p.m. in order to reinvest them on that day. PSOF, ¶ 20, *Tarshes Decl.*, Exh. S (¶ 9).

At 1:50 pm, Mr. Jutan returned Mr. Dunn's call and indicated he had not received the fax. PSOF, ¶ 21. Mr. Dunn resent the fax at 1:59 p.m. *Id.* at ¶ 23. At 2:22 p.m., ING's Treasury Services Department approved the wire request, but the written request sat in a wire rack waiting for a department "releaser" to pick up the folder containing the request and to release the funds. PSOF, ¶ 24. Mr. Dunn called Mr. Jutan again at 3:39 p.m. checking on the status of the transfer. *Id.*

**ORDER - 8**

ILIAC's procedures allowed for the request to have been expedited by being marked "urgent/rush". PSOF, ¶ 22. This was not done in the case of the $100 million plus transfer. PSOF, ¶ 24.

At 3:59 p.m., ING's Treasury Services Department transmitted the request to JP Morgan Chase to wire the $104,698,310.12 plan funds to Prudential's account. PSOF, ¶ 25. JP Morgan Chase received the funds for transfer into Prudential's account at 4:25 pm, and they reached Prudential's account at 4:26 pm. PSOF, ¶ 26. Mr. Wilhem notified BMHC and Mr. Dunn that the wire did not get credited until May 2 since it was received after the close of business on May 1, and therefore, would be invested using the May 2 closing market price. PSOF, ¶ 27.

The Plan participants' had been informed that the transfer would be complete and the funds would be invested on May 1. Accordingly, Plaintiffs transferred $375,790.16 into the Plan participants accounts in order to make them whole for the losses sustained by the late transfer. PSOF, ¶ 28.

## STANDARD OF REVIEW

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

**ORDER - 9**

defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id*. at 248.

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**ORDER - 10**

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it." The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

## ANALYSIS

1. <u>Plaintiffs' Objections</u>

Plaintiffs object to the Magistrate Judge's recommendation to grant summary judgment on Counts Three, Four and Six. The Court has reviewed the objections and finds that Plaintiffs are re-arguing the legal arguments rejected by Judge Boyle. The Court adopts Judge Boyle's well-reasoned analysis on these claims and summarily denies the objections raised by Plaintiffs.

2. <u>Defendant's Objections</u>

Defendant objects to the Magistrate Judge's recommendation to deny summary judgment on the breach of contract claim. Defendant argues the contract is not ambiguous as it only required the assets to be transferred on May 1, 2008 so it is not

**ORDER - 11**

necessary to consider extrinsic evidence to determine the parties' intent of what the parties intended when they contracted for the transfer of assets on May 1, 2008. Additionally, Defendant argues the magistrate judge failed to distinguish a similar factual case in Minnesota, *Dale v. Wells Fargo Bank, N.A.*, 370 F. Supp. 2d 880 (D. Minn. 2005). The Court respectfully disagrees with Defendant's objections.

In interpreting a contract, the intent of the parties is determined from the plain meaning of the words. *Clear Lakes Trout Co. Inc. v. Clear Springs Foods, Inc.*, 106 P. 3d 443, 446 (Idaho 2005). If the terms used in the contract are ambiguous, then the court may turn to extrinsic evidence of the contracting parties' intent to define the terms. For a term to be ambiguous, there must be at least two different reasonable interpretations of the term or the language is nonsensical. *Armstrong v. Farmers Ins. Co. of Idaho*, 139 P.3d 737 (Idaho 2006). There are two types of ambiguity in a contract, patent and latent; a "patent ambiguity" is an ambiguity clear from the face of the instrument in question, while a "latent ambiguity" exists where an instrument is clear on its face, but loses that clarity when applied to the facts at issue. *Knipe Land Co. v. Robertson*, 259 P.3d 595, 601 (Idaho 2011). "Although parol evidence generally cannot be submitted to contradict, vary, add or subtract from the terms of a written agreement that is deemed unambiguous on its face, there is an exception to this general rule where a latent ambiguity appears." *Id.,* (citing *Salfeety v. Seideman ( In re Estate of Kirk )*, 907 P.2d 794, 801 (1995)).

**ORDER - 12**

Whether a contract is ambiguous is a question of law, but interpreting an ambiguous term is an issue of fact. *Knipe Land Co. v. Robertson*, 259 P.3d 595, (Idaho 2011). The Court has reviewed the language at issue in this case and finds the language is latently ambiguous and extrinsic evidence of the parties' intent when the instructions were negotiated can be considered to determine what the parties intended the ambiguous terms to mean at the time they entered the agreement to liquidate and transfer the assets to Prudential.

Defendant is correct that under the terms of the contract it was the burden of BMHC as the Plan's fiduciary to put transfer instructions in writing. See § 8.06 which provides in part:

> The Company will make Payments as directed by the contract Holder, a Participant, or such other authorized party, as applicable. Payment requests must be in writing or as otherwise allowed in administrative practice.

ILIAC's representative wrote to BMHC outlining the specifics of what would be required to transfer the assets to Prudential on the next business day after the funds were liquidated. It is uncontested that written instructions were provided to ILIAC when on April 24, 2008, Stephanie Erickson, a named Plan trustee and BMHC's Vice President of Human Resources, wrote to Carol Decker of ILIAC:

> As you are aware, we will be terminating our service agreement with your firm and transferring the above referenced plans to Prudential Retirement effective May 1, 2008.
>
> Please liquidate the assets in all of the plans listed above on April 30, 2008 and wire the proceeds to Prudential on May 1, 2008 using the wire instructions below.

**ORDER - 13**

It is undisputed that there were no express instructions as to the specific time of day the transfer of assets was to take place on May 1, 2008.  Moreover, the Court agrees with Defendant that Prudential, who was not a party to the contract, cannot act on BMHC's behalf to change the written instructions.  *See Dale v. Wells Fargo Bank, N.A.*, 370 F. Supp. 2d 880 (D. Minn. 2005).  Any modifications to the written instructions needed to be done by BMHC, not Prudential.

However, the Court must look at the complete written instructions, not just the second sentence, to determine if the instructions set forth a requirement that the transfer be completed prior to the market closing on May 1, 2008 and/or that the transfer be received by Prudential prior to the market closing on May 1, 2008.  The Court finds the written instructions state the transfer "to Prudential" was to be "effective on May 1, 2008" and then in the next sentence it says to "wire the proceeds to Prudential on May 1, 2008, using the wire instructions below."

"May 1st" may or may not be ambiguous depending on the context in which it is used.  May 1, 2008 was a certain day of the week and that is not subject to any ambiguity.  However, May 1st, 2008 may be ambiguous or depend upon the parties intent if it is used in conjunction with other descriptive language such as "business day" and/or "effective" that day.  It is unclear whether that the first sentence requiring the transfer be effective on May 1, 2008 controlled the transfer described in the second sentence or if ILIAC was in compliance as long as the assets were transferred anytime on May 1, 2008.

The plain meaning of "effective" would be "producing a decided, decisive or

**ORDER - 14**

desired effect." *Webster's Ninth New Collegiate Dictionary*, 397 (1991).  This plain meaning definition does not seem to clarify the intent of the parties in this case, so the contract terms are latently ambiguous as applied to the facts that existed in this case.  Specifically, the instructions are ambiguous as to what  "effective" means in the context of the asset transfer and the instructions are ambiguous as to  what "to Prudential" means.  Does "effective on May 1, 2008" mean Prudential had to "receive" the transferred assets prior to the close of business, prior to the market closing, prior to the market closing with enough time for reinvestment that same day, or anytime prior to 12:00 a.m. on May 2, 2008?  Does "to Prudential" mean when the wire transfer was "sent" by ILIAC or when the monies were "received into" Prudential's account?  The Court acknowledges the undisputed fact that there was a credit check by JP Morgan Chase that delayed the receipt by Prudential until 4:26 p.m. even though ILIAC wired the transfer from its end at 3:59 p.m.

      Because there are at least two reasonable interpretations of what compliance would be under the terms of the written instructions, the instructions are ambiguous and Judge Boyle was correct in considering for extrinsic evidence of the intent of the parties regarding the transfer language.  This Court agrees with Judge Boyle that the intent of the parties is a disputed issue of material fact which prevents summary judgment from being granted on this claim.  In viewing the facts in light most favorable to the non-moving party, a jury could find that the intent of the parties was that the effective May 1st language in the first sentence modified the second sentence so that the wire transfer to

**ORDER - 15**

Prudential on May 1, 2008 meant Prudential had to receive the funds by the close of business, which in the investment/banking business is based upon when the market closes at 4:00 p.m., not before 5:00 p.m. or before midnight. Whether or not a jury would also find the intent of the parties was that the instructions established that Prudential needed to receive the funds in time to also re-invest the funds that day will have to be determined by the jury with a special verdict form as there are many possible interpretations of the written instructions and the extrinsic evidence and credibility of the witnesses and the industry customs and practices will need to be considered by the jury. The Court would be inclined to agree with Defendant that the jury should be instructed that the ambiguous language of the instructions should be construed against the drafter of the language, but even with such an instruction a jury could find the ILIAC was a sophisticated investor and was aware of the industry customs and practices as well as the intent of BMHC to re-invest the funds that day so the Plan's participants were not at risk of a market fluctuation such as occurred in this case. Or a jury could find that the ambiguous instructions should be construed against BMHC and that a completion of the transfer by ILIAC at 3:59 p.m. complied with the terms, or receipt before the close of business at 5:00 p.m. complied with the written instructions, or receipt of the transferred funds by Prudential anytime before midnight on May 2, 2008 complied with the terms. A jury could find the receipt of funds at 4:26 p.m. was not in compliance with the written instructions as a transfer is not considered completed until the time the monies are received and in order for that receipt to be "effective" May 1, 2008, Prudential needed to have received the funds in their

**ORDER - 16**

account by the close of the market at 4:00 p.m. regardless of whether Prudential had time to re-invest the funds that day as that was not specified in the written instructions. The Court declines to rule at this stage in the litigation which extrinsic evidence is and is not relevant and/or admissible to the parties' intent in drafting the written transfer instructions.

ILIAC has indicated it did not know JP Morgan Chase would do a credit check that would take 27 minutes. But it seems to the Court that risk of a delay due to a credit check should not be on BMHC. BMHC instructed ILIAC to make the transfer effective May 1, 2008 and when ILIAC made the wire transfer at 3:59 p.m., any delay by JP Morgan Chase to make sure ILIAC had the requisite credit to transfer such a large amount of money should not be born by BMHC as it was ILIAC's credit that was being checked, not BMHC's or Prudential's. Moreover, there is evidence in the record that the Court could find that says a wire transfer is "effective" when made by the transferor versus the time when the wire transfer is received by the transferee. Both parties are sophisticated and were aware of the importance of the timing of transfers of millions of dollars, the need to re-invest ERISA monies for the Plan participants, the industry customs and practices regarding wire transfers and use of the terms "effective" and "business day" as was used in the parties' correspondence and negotiations.

In the financial markets, the experts and the parties seem to agree that the close of the business day is when the market closes at 4:00 p.m. That is when the mutual fund prices for the day are set. Unlike stocks which fluctuate during the day as to the price of

**ORDER - 17**

the stock, the price of a share of a mutual fund for a particular day is based on the closing value at the end of the day not at what the mutual fund may have traded at during the day. ILIAC's agent acknowledges that the business day for the banking industry ends at 4:00 p.m. so that funds received after that time cannot be credited against that day's receipts. The wire transfer was initiated by ILIAC at 3:59 p.m. and was not received by Prudential by 4:00 p.m. thereby putting at issue whether or not the transfer was "effective" even if the wire transfer was in compliance with the second sentence that says wire the proceeds on May 1, 2008.

As to *Dale v. Wells Fargo Bank, N.A.*, 370 F. Supp. 2d 880 (D. Minn. 2005), the Court finds that the decision is distinguishable from the facts at bar and is not binding precedent on this Court. In *Dale*, the court held the employer (who was the fiduciary under the plan) and had the authority to set a deadline for the transfer had not done so. Instead, the court found the bank the funds were being transferred to had set the deadline and it had no authority to do so since it was not the ERISA plan fiduciary. Since the fiduciary said only to transfer the assets "as soon as possible" there was no deadline set for the transfer.

In the case at bar, the plan fiduciary, BMHC, did give written instructions that the transfer of assets to Prudential was to be "effective" on May 1, 2008. There is now a dispute as to what the parties may have intended "effective" to mean. The Court finds "effective" as to certain day is much more specific than an instruction "as soon as possible." Therefore, the facts of the case at bar, distinguish the applicability of a federal

**ORDER - 18**

district court case from Minnesota to the District of Idaho.

As discussed earlier, the Court does agree with the analysis in *Dale* regarding whether the transferee's instructions to the transferor can set a deadline for the transfer. To the extent BMHC is arguing they can rely on instructions given by Prudential, this argument is not persuasive nor consistent with the terms of the contract between BMHC and ILIAC. Since Prudential is not the plan fiduciary, ILIAC cannot be held liable for failing to comply with the 4:00 p.m deadline set in the email from Mr. Wilhelm of Prudential. Rather the question that remains is did ILIAC comply with BMHC's written instructions that the transfer to Prudential be effective May 1, 2008.

For all these reasons, the Court finds that summary judgment on the breach of contract claim is not appropriate. As a matter of law, the Court finds the written transfer instructions were ambiguous. The intent of the parties regarding the time the transfer was to be completed is disputed. Because there are genuine issues of material fact regarding the parties' intentions and different possible interpretations of the instructions, this issue must be decided by a jury.

## ORDER

**IT IS ORDERED that:**

1) Defendant's Motion for Summary Judgment (Dkt. 63) is GRANTED IN PART AND DENIED IN PART consistent with this Order.

**ORDER - 19**

2) The parties are directed to estimate the length of trial days necessary, agree to a trial date and file a joint Motion for Trial Setting on or before January 6, 2012. Boise available trial dates are as follows: April 3, April 17, May 1, May 15, or May 29, 2012.

DATED: **December 6, 2011**

Honorable Edward J. Lodge
U. S. District Judge

**ORDER - 20**